PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KRISTINA MCCLURE,<br>*Administrator for the Estate of Decedent,*<br>COLTON MCCLURE, | )<br>)<br>)<br>) CASE NO. 4:24-CV-00116<br>) |
| Plaintiff, | )<br>) |
| v. | ) JUDGE BENITA Y. PEARSON<br>) |
| TRUMBULL COUNTY,<br>*et al.,* | ) **MEMORANDUM OF**<br>) **OPINION AND ORDER**<br>) [Resolving ECF No. 83 and ECF No. 106] |
| Defendants. | ) |

The Court simultaneously considers Defendants' two Motions for Summary Judgment
(ECF No. 83 and ECF No. 106).[1]  Both Motions are granted for the reasons herein.

**I.  INTRODUCTION**

**A.  Background**

In the last half-decade, over 20,000 Ohioans died from narcotics abuse.  Thirty-one-year-
old Colton McClure enlarged that number by one on August 9, 2022.  His death came after
approximately 27 hours in a Warren, Ohio jail cell.  An autopsy revealed he had used
methamphetamine, fentanyl, and acetyl fentanyl.  Colton's sister—the administrator of his

---

[1] Defendants are categorized into two groups by position and legal representation: (1)
"Custodial Defendants" ("CDs"), consisting of corrections officers at the Trumbull County Jail;
and (2) "Medical Defendants" ("MDs"), consisting of medical staff at the Trumbull County Jail.

(4:24-CV-00116)

estate—now sues county correctional officers and medical staff alleging violations of the United States Constitution and state law.  All claims are ripe for summary judgment.

### B.  Factual History

While the parties dispute some facts, a common narrative is clear and corroborated by jail records and security footage documenting nearly the entirety of Colton McClure's detention. Surveillance Files, ECF No. 121 at PageID #: 3242.  At 4:00 PM on August 6, 2022, Colton arrived for his evening shift at Romeo's Pizza in Streetsboro, Ohio.  ECF No. 1 at PageID #: 10, ¶ 26.  He was four hours late and, to his co-workers, appeared intoxicated and incoherent.  ECF No. 1 at PageID #: 11, ¶ 28.  Fearing for Colton's safety, his assistant manager called 911.  ECF No. 1 at PageID #: 11, ¶ 28.  Officers from the Streetsboro Police Department arrived at Romeo's and discovered Colton was a wanted man.[2]  ECF No. 1 at PageID #: 11, ¶ 29.  He was arrested.  ECF No. 1 at PageID #: 11, ¶ 29.  Trumbull County Deputy Sheriff John Dina transported Colton to the Trumbull County Jail and reported him as "highly intoxicated" and that officers found narcotics and drug paraphernalia in his possession.  ECF No. 1 at PageID #: 11, ¶ 31.  Colton was described as "talkative, paranoid, and alert" *en route*.  Springer Dep. Tr., ECF No. 83–2, Ex. A at Page ID # 486:1–3; Dina Aff., ECF No. 83–23, Ex. V at PageID # 679.

Entering detention, Colton stood 5'6" and weighed just 100 pounds.  ECF No. 31 at PageID #: 252, ¶ 11.  The booking process included a medical intake screening and completion of a form by MD Bach, who recorded that Colton had multiple sclerosis, a history of narcotics

---

[2] Colton had outstanding warrants for driving under the influence and theft in Trumbull County Court and Newton Falls Municipal Court, respectively.

(4:24-CV-00116)

abuse, and an active prescription for *Sublocade*.[3]  ECF No. 31 at PageID #: 253, ¶ 19.  Colton's

vital signs were normal, although he admitted using heroin earlier that day.  Booking Assessment

Form, ECF No. 87, Ex. 2 at PageID #: 955.  Neither Colton nor the jail's intake records

mentioned methamphetamine, fentanyl, or acetyl fentanyl, the drugs found in his body at death.

ECF No. 87, Ex. 2 at PageID #: 955; Bach Dep. Tr., ECF No. 88 at PageID ##: 978:11–980:6.

CD Musolino partially booked Colton and placed him alone in a holding cell at 5:20 PM.

ECF No. 1 at PageID #: 17, ¶ 65.  His behavior was highly erratic therein, running around,

attacking the cell door, rolling on the floor, screaming, and stripping off his clothes.  ECF No. 1

at PageID #: 18, ¶¶ 69–71.  At approximately 7:50 PM, Colton stated he wanted to kill himself,

prompting CD McCord to place him on "C–58" suicide prevention status.[4]  ECF No. 1 at PageID

#: 18, ¶ 72; McCord Dep. Tr., ECF No. 83–8, Ex. G at PageID #: 558:6–11.

MD Simmons checked on Colton at 10:30 PM—around five hours after he entered

detention—but could not safely take his vitals due to his erraticism.  Simmons Dep. Tr., ECF No.

83–4, Ex. C at PageID #: 519:16–20.  At 11:30 PM, corrections officers moved Colton to a new

cell where he alternated between prostration and volatility.  ECF No. 1 at PageID #: 19–20, ¶¶

74–80.  Three hours later—now the morning of August 7, 2022—CD Fife and CD McCord

escorted Colton to the booking area to complete fingerprinting.  ECF No. 31 at PageID #: 255, ¶

---

[3] A brand name, extended-release injection of *buprenorphine* used to treat moderate to severe opioid use disorder in adults.

[4] On C–58 status, corrections officers visually check the detainee every ten minutes through their cell door window and record those checks on a jail activity log.  The officer ensures the detainee is breathing, not self-harming, and does not need medical attention.  Zakrasjek Dep. Tr., ECF No. 83–7, Ex. F at PageID ##: 542:22–543:25; Frame Dep. Tr., ECF No. 94 at PageID ##: 1511:23–1512:6.

(4:24-CV-00116)

35.  CD Zakrajsek requested medical assistance to evaluate Colton, prompting MD Simmons to respond to the booking area.  Fife Dep. Tr., ECF No. 83–9, Ex. H at PageID #: 570:18–21. Colton, however, remained uncooperative and hostile, attempting to bite and kick CD Fife during fingerprinting.  Fife Dep. Tr., ECF No. 83–9, Ex. H at PageID #: 571:18–25.  Again, MD Simmons could not complete a medical evaluation due to Colton's conduct.  Simmons Dep. Tr., ECF No. 87 at PageID #: 930:7–9.  Colton then defecated on the hallway floor.  ECF No. 1 at PageID #: 25, ¶ 95.  Corrections officers walked him to the shower, where he defecated anew and hurled his excrement at the walls.  ECF No. 1 at PageID #: 23, ¶ 91.  He was placed in a suicide gown at 3:22 AM and returned to his cell.[5]  ECF No. 1 at PageID #: 26, ¶ 102.  Plaintiff acknowledges that Colton was "within the audio/visual [view of the] monitoring system" at all relevant times.  ECF No. 1 at PageID #: 17, ¶ 67.  He refused and made no requests for medical attention during his detention.  *See* Simmons Dep. Tr., ECF No. 87 at PageID ##: 912:21–913:5 (stating, "Colton made no request for medical attention"); ECF No. 87, Ex. 1 at PageID #: 954 (report confirming no request for medical attention); ECF No. 83 at PageID #: 460 (citing deposition of CD Zakrajsek who testified that "due to [Colton's] behavior in the changeout and him refusing medical, [MD Simmons] did not complete [an evaluation].").  Despite Colton's apparent intoxication, CD Fife thought him competent to decline medical care because he was

---

[5] A tear-resistant, single-piece outer garment that prevents a detainee from forming a noose to commit suicide.

4

(4:24-CV-00116)

speaking in complete sentences. Fife Dep. Tr., ECF No. 83–9, Ex. H at PageID #: 573:7–22 (testifying, "[h]e formed the complete sentence stating that he didn't want medical.").[6]

Throughout the morning, Colton remained active and continued to pace his cell, use the toilet, and alternated between standing, sitting, and lying down on the bench. Surveillance Files, ECF No. 121 at PageID #: 3242. At 1:39 PM, he laid down on the floor, appearing to attempt to rest but remaining agitated and unsettled. Surveillance Files, ECF No. 121 at PageID #: 3242. At 6:22 PM, Colton was awake on the floor with his knees upright and his head towards the cell door. ECF No. 1 at PageID #: 29, ¶ 113. CD Carducci, the newly arrived officer-in-charge, requested medical assistance to check on Colton because "something didn't look right" to her while viewing the security footage monitoring Colton's cell. Carducci Dep. Tr., ECF No. 83–13, Ex. L at PageID #: 606:14–18. Correctional officers and MD Thomas entered the cell, checked Colton's vitals, and reported he "felt very cold and very disoriented" and "was whispering things and rocking his head back and fourth [sic]." ECF No. 1 at PageID #: 30, ¶ 117. MD Thomas could not obtain a pulse and consequently called her supervisor, MD Dr. Malvasi, who agreed that CD Carducci should call an ambulance. ECF No. 1 at PageID #: 30, ¶¶ 115–18. While waiting for the ambulance, CD Dillon entered the cell and administered chest compressions to Colton. Carducci Dep. Tr., ECF No. 83–13, Ex. L at PageID #: 607:14–16; ECF No. 143 at PageID #: 3719. MD Thomas assisted in applying an automated external defibrillator. Thomas

---

[6] CD Fife admitted that Colton's declination of medical care did not necessarily change his opinion of whether Colton should have been evaluated, but he acknowledged that decision was Colton's to make. See Fife Dep. Tr., ECF No. 83–9, Ex. H at PageID #: 574:16–17 (testifying, "that's on him").

5

(4:24-CV-00116)

Dep. Tr., ECF No. 104–2 at PageID ##: 2596:17–2597:12.  An ambulance arrived at 6:45 PM and emergency medical technicians evacuated Colton to the Trumbull Regional Medical Center at 6:59 PM.  ECF No. 143 at PageID #: 3719; ECF No. 1 at PageID #: 35, ¶ 141.  Colton died there two days later on the morning of August 9, 2022.  ECF No. 1 at PageID #: 35, ¶ 142.

The primary cause of Colton's death was "hemodynamic instability secondary to anoxic encephalopathy post-cardiac arrest."  ECF No. 1 at PageID #: 35, ¶ 142.  Post-mortem toxicology confirmed that Colton was positive for methamphetamine, fentanyl, and acetyl fentanyl.  ECF No. 1 at PageID #: 35, ¶ 142.  He did not test positive for heroin.  Meagher Dep. Tr., ECF No. 83–16, Ex. O at PageID #: 638:12–25.  Plaintiff's expert, a forensic pathologist, contends Colton died from "acute multidrug intoxication due to meth and fentanyl."[7]  Springer Dep. Tr., ECF No. 83–2, Ex. A at PageID #: 487:8–12.  Defendants counter that Colton did not die from an overdose, but from chronic narcotics abuse, as the level of drugs in his system were non-fatal.  ECF No. 83–1 at PageID #: 464, ¶ 2.[8]  Custodial and Medical Defendants deny all liability for Colton's death.  ECF No. 31 at PageID #: 250, ¶ 2.

---

[7] Plaintiff's expert explained that "acute*" refers to the recency of narcotics use, not the amount of narcotics in one's system.  Springer Dep. Tr., ECF No. 85, at PageID #: 729:11–21 (testifying that "[t]his is an intoxication meaning that Mr. McClure was fine, then Mr. McClure took some drugs and then within one to two days Mr. McClure was affected by those drugs to the point of being severely affected and died from those drugs.  So that's why it's all acute and that's why it's intoxication.").

[8] Plaintiff's experts do not object to Defendants' argument that medical experts cannot identify the contribution to death caused by Colton's chronic drug use versus his recent acute drug use.  Simpson Dep. Tr., ECF No. 99 at PageID #: 2064:4–9 (agreeing there is no way "to parse the contribution to that lethality between the effect of chronic drug use and the acute drug use"); Meagher Dep. Tr., ECF No. 103 at PageID #: 2471:10–21(agreeing that corrections officers would not recognize that when narcotics are mixed, detoxification can take longer).

(4:24-CV-00116)

## C. Procedural History

Plaintiff Kristina McClure is Colton's sister and administers his estate. ECF No. 1 at PageID #: 6, ¶ 5. She filed this civil action in federal court on January 19, 2024 asserting violations of state law and federal law. ECF No. 1 at PageID #: 5, ¶ 1. She seeks relief through nine causes of action:

*Federal Claims—*

(1) Deliberate indifference in violation of 42 U.S.C. § 1983 (against all Defendants). ECF No. 1 at PageID ##: 38–44. ¶¶ 156–73.

(2) Improper hiring/retention; failure to train/supervise; custom or practice of tolerating the violation of federal rights; and inadequate policy in violation of 42 U.S.C. § 1983 (against CD Trumbull County, CD Monroe, and CD Mason). ECF No. 1 at PageID ##: 45–52, ¶¶ 174–94.

(3) Inadequate policies, practices, customs, training, and supervision in violation of 42 U.S.C. § 1983 (against CD Trumbull County, CD Monroe, and CD Mason). ECF No. 1 at PageID ##: 52–56, ¶¶ 195–213.

(4) Excessive force in violation of 42 U.S.C. § 1983 (against CD Fife).[9] ECF No. 1 at PageID ##: 56–58, ¶¶ 214–26.

*State Claims—*

(5) Medical malpractice in violation of Ohio law (against all Medical Defendants). ECF No. 1 at PageID ##: 58–61, ¶¶ 227–36.

(6) Medical malpractice in violation of Ohio law (against MD Malvasi, LLC and MD Dr. Malvasi). ECF No. 1 at PageID ##: 61–63, ¶¶ 237–45.

---

[9] Dismissed *via* joint stipulation on August 8, 2025 after Defendants filed their motions for summary judgment. ECF No. 129.

(4:24-CV-00116)

(7) Negligence and reckless conduct by a jail employee in violation of Ohio law (against all Custodial Defendants). ECF No. 1 at PageID ##: 63–64, ¶¶ 246–50.

(8) Wrongful death in violation of Ohio Rev. Code § 2125.02 (against all Defendants). ECF No. 1 at PageID ##: 64–65, ¶¶ 251–54.

(9) Survivorship claim under Ohio Rev. Code § 2305.21 (against all Defendants). ECF No. 1 at PageID #: 66, ¶¶ 255–56.

As indicated previously, Defendants are grouped by profession and representation. "Custodial Defendants" are local officials and corrections officers including: (1) Trumbull County; (2) Sheriff Paul Monroe;[10] (3) Major Daniel Mason; (4) Officer Gary Musolino; (5) Officer Ryan Fife; (6) Officer Jose McCord; (7) Officer Dan Zakrajsek; (8) Officer William Dreier; (9) Officer Christopher Kenney; (10) Officer Robert Dillon; (11) Sergeant Barbara Carducci; (12) Officer Zachary Ferguson; (13) Officer Megan Frame; (14) Officer Sean Maskaluk; (15) Officer Elijah Bricker; and (16) Officer Randi McElhinny.[11] ECF No. 1 at PageID ##: 6–10, ¶¶ 5–25. "Medical Defendants" are jail medical staff including: (1) Malvasi,

---

[10] On October 15, 2025, the Court granted Custodial Defendants' motion to add Michael Wilson, the current sheriff of Trumbull County, to this case in his official capacity under Fed. R. Civ. P. 25(d). ECF No. 142.

[11] (1) Trumbull County is a political subdivision of Ohio; (2) Paul Monroe was the elected sheriff of Trumbull County during Colton's detention, which operates the Trumbull County Jail; (3) Daniel Mason was the administrator of the Trumbull County Jail; (4–16) Officers Gary Musolino, Ryan Fife, Jose McCord, Dan Zakrajsek, William Dreier, Christopher Kenney, Robert Dillon, Zackary Ferguson, Megan Frame, Sean Maskaluk, Elijah Bricker, Randi McElhinny, and Sergeant Barbara Carducci were Trumbull County Sheriff's Office employees working at the Trumbull County Jail. ECF No. 31 at PageID #: 251, ¶ 6.

(4:24-CV-00116)

LLC; (2) Dr. Philip Malvasi; (3) Medical Assistant Jennifer Bach; (4) Medical Assistant Ladaja

Thomas; (5) Medical Assistant Tayler Simmons; and (6) Nurse Carla Ahart.[12]

Custodial and Medical Defendants answered on March 4 and April 23, 2024,

respectively.  ECF No. 31; ECF No. 34.  The Court later granted stipulated dismissal for all

claims against CD Mason, CD Dillon, CD Maskaluk, CD Bricker, and CD McElhinny.  ECF No.

78.  It also dismissed the sole excessive force claim—in Count 4—against CD Fife.  ECF No.

129.  Custodial and Medical Defendants moved separately for summary judgment under Fed. R.

Civ. P. 56(a).  ECF No. 83; ECF No. 106.  Plaintiff opposed both motions, and Defendants

replied in turn.  ECF No. 125; ECF No. 126; ECF No. 131; ECF No. 132.  Plaintiff moved for

continuance and leave to file a supplemental brief, which the Court granted in part.  ECF No.

133; ECF No. 136; ECF No. 137.  Custodial Defendants also moved for (and received) leave to

file supplemental authority.  ECF No. 141.  The motions are now fully briefed.  The parties

jointly submitted a stipulated statement of facts and conferred in person at a final pretrial

conference in Youngstown, Ohio on October 22, 2025.  ECF No. 143; Min. of Proc. [Non-

Document] dated 10/22/2025.

### D.  Custodial Defendants' Motion for Summary Judgment

Custodial Defendants argue that summary judgment is appropriate because:

> (1) Custodial Defendants did not act with deliberate indifference to
> any serious medical need.

---

[12] (1) Malvasi, LLC is an Ohio business contracted by Trumbull County to provide
medical care to detainees at the Trumbull County Jail; (2) Dr. Malvasi is principal of Malvasi,
LLC; (3–5) Jennifer Bach, Ladaja Thomas, and Tayler Simmons are employees of Malvasi,
LLC; (6) Carla Ahart is a former employee of Malvasi, LLC.  ECF No. 34 at PageID #: 292, ¶¶
8–10.

(4:24-CV-00116)

(2) CD Fife used reasonable minimal force against Colton.

(3) Custodial Defendants are entitled to qualified immunity.

(4) Plaintiff cannot establish a constitutional violation under *Monell*.

(5) The policies, practices, and customs of Trumbull County. and the training and supervision of Custodial Defendants are not deliberately indifferent or the direct cause of any claimed constitutional violation.

(6) Custodial Defendants are entitled to state qualified immunity.

(7) Punitive damages cannot be assessed against CD Trumbull County because it is a political subdivision.

ECF No. 83–1 at PageID #: 456, ¶ 1.

Plaintiff responds:

(1) There are genuine disputes of material fact supporting Plaintiff's claim of deliberate indifference under 42 U.S.C. § 1983.

(2) Custodial Defendants are not entitled to qualified immunity.

(3) The *Monell* claim must be evaluated on its merits because there is a factual dispute over a constitutional tort.

(4) The *Monell* claim does not fail on the merits.

(5) Although CD Trumbull County is entitled to state qualified immunity, individual Custodial Defendants are not.

(6) Plaintiff's wrongful death and survivor claims are neither barred by immunity nor deficient in establishing a factual dispute of a wrongful act.

ECF No. 126 at PageID ##: 3411–27, ¶¶ A–G.

Custodial Defendants reply:

(1) They were not deliberately indifferent to a serious medical need.

(2) The evidence fails to establish an objectively serious medical need.

(3) The evidence fails to establish they acted recklessly.

(4) They are entitled to qualified immunity.

10

(4:24-CV-00116)

      (5) Plaintiff's *Monell* claim fails on the merits.

      (6) They are entitled to state qualified immunity.

ECF No. 131–1 at PageID ##: 3449–66.

### E. Medical Defendants' Motion for Summary Judgment

Medical Defendants argue that summary judgment is appropriate because:

> (1) MD Ahart was not on duty at any time during the events in question and had no awareness of Colton's condition.
>
> (2) MD Bach was not deliberately indifferent to Colton's serious medical needs and was not negligent or reckless in permitting Colton to be admitted to jail, rather than sending him to a hospital.
>
> (3) MD Simmons was neither negligent nor reckless in not attempting to evaluate Colton's vital signs when it was not safe to do so.
>
> (4) MD Thomas was not deliberately indifferent to Colton's serious medical needs and was neither negligent nor reckless in calling MD Dr. Malvasi for guidance on whether to contact emergency medical services.
>
> (5) Absent knowledge of Colton's condition, neither MD Dr. Malvasi nor MD Malvasi, LLC are liable under theories of deliberate indifference or negligence.

ECF No. 106 at PageID ##: 2689–95, ¶¶ A–E.

Plaintiff responds:

> (1) MD Ahart has supervisory liability under state law.
>
> (2) There are genuine disputes of material fact as to whether MD Bach negligently and recklessly disregarded Colton's need for medical attention.
>
> (3) MD Simmons did not intervene when Colton needed medical attention.
>
> (4) MD Thomas delayed by not calling 911 immediately.
>
> (5) MD Dr. Malvasi and MD Malvasi, LLC have supervisory liability under state law.

(4:24-CV-00116)

(6) MD Dr. Malvasi and MD Malvasi, LLC are liable for not establishing drug intoxication protocols at the Trumbull County Jail.

(7) There is evidence that MD Dr. Malvasi breached the standard of care.

ECF No. 125 at PageID ##: 3377–86.

Medical Defendants reply:

(1) There is no genuine dispute of material fact that Colton had a serious medical need when he arrived at the Trumbull County Jail.

(2) For the first fifteen hours of his detention, there were no requests to Medical Defendants to assess Colton.

(3) Plaintiff has not responded to MD Ahart's argument that she is not liable for deliberate indifference.

(4) Plaintiff cannot establish that MD Ahart had any knowledge of Colton's condition during detention.

(5) There is no evidence that MD Bach was deliberately indifferent to a serious medical need.

(6) There is no evidence that MD Simmons was deliberately indifferent to a serious medical need.

(7) Plaintiff makes no argument that MD Thomas was deliberately indifferent to a serious medical need.

(8) Plaintiff did not plead a valid *Monell* claim against MD Dr. Malvasi or MD Malvasi, LLC.

(9) Absent unconstitutional conduct by a subordinate, MD Dr. Malvasi cannot be held liable as a supervisor.

(10) MD Dr. Malvasi was neither deliberately indifferent nor negligent to a serious medical need.

ECF No. 132 at PageID ##: 3588–602.

(4:24-CV-00116)

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Defendants contest neither jurisdiction nor venue.  ECF No. 31 at PageID #: 250, ¶ 1; ECF No. 34 at PageID #: 291.  Even so, the Court assesses its subject matter jurisdiction *sua sponte*, as federal courts have a comparatively limited mandate.  *See* Fed. R. Civ. P. 12(h)(3); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 375 (1994).  Congress has extended them subject matter jurisdiction only over "civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331; *see Osborn v. Bank of U.S.*, 9 Wheat. 738, 823–24 (1824).  A civil action arises under national law when a federal statute or regulation creates the asserted cause of action.[13]  *See Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916).  Federal courts may extend their jurisdiction over state-law claims so long as they "derive from the same nucleus of operative fact" as federal ones.  *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)); *see* 28 U.S. C. § 1367.

Plaintiff's first four claims arise under 42 U.S.C. § 1983.  ECF No. 1 at PageID ##: 38–56.  That statute allows individuals to sue government actors for deprivations of their constitutional rights.  As such, Counts 1, 2, and 3 arise under federal law sufficient for the Court to lawfully exercise jurisdiction over them.  *See* 28 U.S.C. § 1331.  Plaintiff's remaining five

---

[13]  This test has been clarified to require only that the complaint necessitate resolution of a substantial question of federal law.  *See Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 13 (1983).

(4:24-CV-00116)

claims arise from Ohio common and statutory law, yet derive from the "same nucleus of operative fact" as her federal causes of action (*i.e.*, Colton's 27-hour detention).  ECF No. 1 at PageID ##: 61–66.  Accordingly, the Court can (and does) exercise supplemental jurisdiction over Counts 5, 6, 7, 8, and 9.  *See* 28 U.S.C. § 1367.

**B.  Summary Judgment**

Summary judgment is a procedural device allowing federal courts to resolve civil suits (or claims, or issues) without trial.  It is appropriate only when the pleadings, discovery, and disclosed materials reveal no genuine dispute of material fact, thereby entitling the moving party to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The movant must demonstrate that the non-moving party has failed to establish an essential element on which she bears the burden of proof.  *See* *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992).  The movant is not required to negate a burdenless claim, so long as she relies on the absence of an essential element of the same.  *See* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once a litigant properly moves for summary judgment, the burden shifts to the non-movant to establish a genuine dispute of material fact.  A fact is *material* if its resolution will affect the outcome of the litigation, and a dispute is *genuine* if the evidence would permit a reasonable jury to find the non-movant entitled to a favorable verdict.  *See* *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The non-movant cannot rely on pleadings alone; she must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *see* *Guarino*, 980 F.2d at 403.

When assessing a motion for summary judgment, federal courts view the evidence in the

14

(4:24-CV-00116)

light favorable to the non-movant.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (superseded on other grounds).  The mere existence of a dispute, however, is insufficient.  *See Scott*, 550 U.S. at 380 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).  A court's responsibility is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Liberty Lobby*, 477 U.S. at 249).  Assessing witness credibility, weighing evidence, and drawing logical inferences are traditional obligations of juries, not judges.  *See Liberty Lobby*, 477 U.S. at 255. That said, federal courts are under no obligation to "search the entire record to establish that it is bereft of a genuine issue of material fact" before granting summary judgment.  *Guarino*, 980 F.2d at 404.  Rather,

> [i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome.

*Id.* at 406.  Federal courts merely decide whether there are genuine disputes requiring resolution through civil trial, as a "free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not."  *Id.*

## III.  DISCUSSION

### A.  Federal Claims

Plaintiff's federal claims hinge on her belief that Defendants deprived her brother of a constitutional right to adequate healthcare.  Under § 1983, any state actor who deprives an individual of any "rights, privileges, or immunities secured by the Constitution or laws" faces

(4:24-CV-00116)

civil liability. To prevail, a plaintiff must prove: (1) there was a deprivation of a constitutional right; and (2) that deprivation was "caused by a person acting under the color of state law." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010). When a plaintiff sues multiple defendants, she must satisfy a third requirement: "that each defendant, through that defendant's own actions," subjected the plaintiff (or caused the plaintiff to be subjected to) a constitutional deprivation. *Rudd v. City of Norton Shores, Mich.*, 977 F.3d 503, 512 (6th Cir. 2020) (citing *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020)).

Federal and state governments are constitutionally obligated to provide adequate medical care for those they incarcerate. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Mere failure to adequately provide such care does not, however, automatically occasion a constitutional violation. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). Instead, § 1983 implicates civil remedies only when there is "deliberate indifference to a prisoner's serious illness or injury." *Estelle*, 429 U.S. at 105; *see Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (noting that a plaintiff must show "obduracy and wantonness" rather than "inadvertence or error in good faith.")).

The Supreme Court distinguishes claims brought by convicted prisoners from claims brought by pretrial detainees. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Although the Eighth Amendment does not apply to pretrial detainees, the Fourteenth Amendment does—affording them a due process right to freedom from inadequate medical care. *See Graham v. Cnty. of Washtenaw*, 358 F.3d 377 (6th Cir. 2004). In weighing alleged deprivations of that right, liability is assessed on an individual, person-by-person basis. *See Howell v. NaphCare,*

16

(4:24-CV-00116)

*Inc.*, 67 F.4th 302, 312 (6th Cir. 2023). Local governments are considered "persons" under §
1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

As a pretrial detainee, Colton was entitled to freedom from deliberate indifference to his
medical needs. *See Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022). Plaintiff
plausibly alleges that her brother was deprived of that right, thus satisfying the first prong of a
*prima facie* § 1983 claim. When private medical professionals contract with local jails to
provide healthcare, they are considered state actors acting under color of state law. *See Winkler
v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521
(6th Cir. 2008)). Private businesses contracted to provide medical services and medical
professionals to jails can be liable under § 1983 because they perform what is traditionally a state
function. *See Winkler*, 893 F.3d at 904. Local government corrections and law enforcement
officers are, of course, state actors. Accordingly, all Defendants were acting under color of state
law sufficient to satisfy the second prong of § 1983. The third prong (individual, rather than
collective liability) turns on the nature of each claim asserted. *See Rudd*, 977 F.3d at 512.

### 1. Count 1—Deliberate Indifference

The Sixth Circuit standard for a viable deliberate indifference claim under § 1983
emerges from *Brawner v. Scott County* and its progeny. 14 F.4th 585 (6th Cir. 2021). Reading
those cases together, a plaintiff must satisfy three elements to succeed:

> (1) The pretrial detainee had an objectively serious medical need.
>
> (2) A reasonable defendant at the scene (knowing what the
> defendant knew at the time of the incident) would have understood
> that the pretrial detainee's medical needs subjected them to an
> excessive risk of harm.

17

(4:24-CV-00116)

> (3) The defendant knew that their failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.[14]

*See Trozzi v. Lake Cnty., Ohio*, 29 F.4th 745, 757–58 (6th Cir. 2022) (citing *id.*; *Kingsley*, 576 U.S. at 389; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); and *Greene*, 22 F.4th at 607), *contra Whyde v. Sigsworth*, No. 22–3581, 2024 WL 4719649, at *2 (6th Cir. Nov. 8, 2024) (positing "a lower standard that does not require actual knowledge of a serious risk of harm"). Mere negligence is insufficient, as the defendant must have acted not only deliberately, but recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."[15] *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836). Precedent cautions district courts against using the armchair general's benefit of hindsight in these analyses. *See Trozzi*, 29 F.4th at 756. Instead, they must look to what each defendant *actually knew* at the relevant time. *See id.* (emphasis added). While supervising officials may be liable when they "encouraged the specific incident of misconduct or in some other way directly participated in it," a plaintiff cannot "generically hold one defendant liable for another's actions." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016); *Rudd*, 977 F.3d at 512.

---

[14] *See, e.g.*, *Greene*, 22 F.4th at 613 (considering a jail official's training and knowledge of the detainee's condition); *Britt v. Hamilton Cnty.*, 2022 WL 405847, at *5 (6th Cir. Feb. 10, 2022) (examining what a prison official knew about a detainee's medical plan); *cf. Westmoreland v. Butler Cnty.*, 29 F.4th 721, 729 (6th Cir. 2022) (holding that a "defendant officer must act intentionally in a manner that puts the plaintiff at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause the plaintiff's injuries.").

[15] A reasonability standard that disregards a defendant's specific knowledge would be "tantamount to determining whether that [defendant] was negligent." *Trozzi*, 29 F.4th at 755.

18

(4:24-CV-00116)

### *a. Colton had an objectively serious medical need.*

The first question, answered affirmatively, is whether Colton had an objectively serious need for medical attention. The Sixth Circuit routinely holds that "a condition resulting in death is sufficiently serious to meet the objective component" of deliberate indifference. *Howell*, 67 F.4th at 311–12 (quoting *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021)). Colton died. ECF No. 1 at PageID #: 35. Even absent death, his belligerent behavior and distressing demeanor were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ash*, 539 F.3d at 518 (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)). This obviousness applies to Custodial and Medical Defendants alike. *See Shadrick v. Hopkins Cnty.*, 805 F.3d 737 (6th Cir. 2015) (noting "the deputy jailers could tell that [the detainee] needed prompt medical treatment even though they did not have the same medical training as [the nurses]."). Some conditions are so obvious that they become a matter of respecting human dignity rather than undergoing medical training.

To be sure, the generalized intoxication of a pretrial detainee is not *per se* indicative of an objectively serious medical need. *See Border v. Trumbull Cnty. Bd. of Comm'rs.*, 414 App'x 831, 837 (6th Cir. 2011). During his detention, however, Colton, *inter alia*: (1) appeared intoxicated; (2) admitted to recent and chronic narcotics abuse; (3) expressed suicidal ideation; (4) erratically prowled his cell; (5) defecated, both on himself and on the floor; (6) handled and hurled his own excrement; (7) screamed at corrections officers and medical staff; (8) rolled around on the floor; (9) was unable to support his own bodyweight; (10) fell in and out of consciousness; and (11) attempted to bite correctional officers (after claiming he had Hepatitis). Such aberrant behavior was sufficiently indicative that Colton had an objectively serious medical

19

(4:24-CV-00116)

need during his detention. The first element for deliberate indifference is satisfied as to all Defendants irrespective of profession or position.

>    **b.  No Defendant deliberately acted with reckless disregard towards Colton.**

The second (and more difficult) question is whether any Defendants subjectively acted with reckless disregard for Colton's serious medical need. Outlining each parties' individual conduct below, the answer is no.

>    **i.  Custodial Defendants did not act with reckless disregard.**

Custodial Defendants are not medical professionals, and their conduct is assessed with comparative leniency in determining whether they violated Colton's constitutional right.[16] *See Mercer*, 72 F.4th at 162; *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019) (noting that "the training that officers receive (when they are not the primary medical care providers) and the training that licensed practical nurses receive (when they are the primary medical care providers), along with the tasks they must perform, are meaningfully different."). Still, "a defendant need not [be capable of diagnosing] the cause of the medical distress in order for such need to indicate medical issues beyond the defendant's capability that require emergency care." *Grote v. Kenton Cnty.*, 85 F.4th 397, 409 (6th Cir. 2023). Viewing the evidence in the light most favorable to Plaintiff, there is no genuine dispute of material fact as to whether any Custodial Defendants acted with reckless disregard towards Colton's condition. A

---

[16] The failure to follow internal policies does not alone constitute deliberate indifference. *See Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010) (noting than an awareness of a policy and the failure to comply with it "is not a *per se* constitutional violation").

20

(4:24-CV-00116)

reasonable jury could not render Plaintiff a favorable verdict on Count 1 under § 1983.  *See* Fed. R. Civ. P. 56(a); *Karnes*, 398 F.3d at 873.

First, neither CD Trumbull County nor CD Monroe acted with knowledge of or indifference towards Colton's medical need.  *See Brawner*, 14 F.4th at 596–97.  There is insufficient evidence for a reasonable jury to find that Colton's death was a consequence of their supervisory conduct or misconduct.  At minimum, Plaintiff needed to show that CD Trumbull County or CD Monroe "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross*, 818 F.3d at 242 (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).  CD Monroe, however, never met or interacted with Colton, nor does Plaintiff coherently contend that he or CD Trumbull County acquiesced to the allegedly unconstitutional conduct of their subordinates.[17]  Monroe Dep. Tr., ECF No. 83–14, Ex. M at PageID #: 165:12–16.

Next, although Defendants admit that CD Musolino, CD Zakrasjek, and CD Fife interacted with Colton the most, Plaintiff fails to offer sufficient evidence that any of them acted with reckless disregard towards his medical need.  ECF No. 83 at PageID #: 469, ¶ 2.  CD Musolino was working at the jail when Colton arrived.  Musolino Dep. Tr., ECF No. 83–3, Ex. B at Page ID #: 503:17–19.  He summoned MD Bach for booking and was present for Colton's intake medical assessment.  ECF No. 83–1 at PageID #: 469.  He helped book Colton and signed

---

[17] Still, a federal court may "consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Grote*, 85 F.4th at 414.  But, as Plaintiff fails to establish a constitutional violation, she fails to establish how either CD Trumbull County or CD Monroe were moving forces of violative conduct.

21

(4:24-CV-00116)

the assessment form completed by MD Bach.  ECF No. 83–1 at PageID #: 470; ECF No. 126 at PageID #: 3397, ¶ B.  CD Zakrasjek was also present for Colton's intake.  ECF No. 83–1 at PageID #: 469.  He aided CD Musolino in booking Colton and later escorted him back to the booking area for attempted fingerprinting.  ECF No. 83–1 at PageID #: 470; ECF No. 126 at PageID #: 3398, ¶ C.  CD Fife also aided in booking Colton and escorted him to and from the holding cell.  Fife Dep. Tr., ECF No. 83–9, Ex. H at PageID #: 577:6–9; ECF No, 126 at PageID #: 3402, ¶ D.  He later aided CD Zakrasjek in trying to obtain Colton's fingerprints, during which Colton assaulted him.  Fife Dep. Tr., ECF No. 83–9, Ex. H at PageID #: 571:18–25.  Nothing in the record sufficiently establishes that CD Musolino, CD Zakrasjek, or CD Fife violated Colton's constitutional right.

Third, Plaintiff fails to offer sufficient evidence that the remaining Custodial Defendants acted with reckless disregard.  CD McCord, CD Kenney, CD Dreier, CD Frame, CD Ferguson, and CD Carducci had far less interaction with Colton than CD Musolino, CD Zakrasjek, and CD Fife.  CD McCord was working at the jail during the early stages of Colton's detention.  McCord Dep. Tr., ECF No. 83–8, Ex. G at PageID #: 558:2–5.  He observed that Colton was highly intoxicated and rightly placed him on C–58 status when he expressed a desire to commit suicide.  ECF No. 126 at PageID #: 3398, ¶ 1.  CD Kenney and CD Dreier's sole interaction with Colton was escorting him from the booking area to his holding cell after cleanup.  ECF No. 83–1 at PageID #: 470.  While they recognized Colton was intoxicated (as any reasonable person would), they did not believe his condition was so abnormal as to require immediate medical attention, nor did they recklessly disregard his health in failing to provide for or secure that attention.  Kenney Dep. Tr., ECF No. 95 at PageID #: 1588:9–10; Dreier Dep. Tr., ECF No. 101 at PageID #:

22

(4:24-CV-00116)

2335:17–18.  CD Frame's and CD Ferguson's limited interactions with Colton consisted of ten-minute status checks under C–58 policy for suicidal detainees.  ECF No. 83–1 at PageID #: 471.  During those checks, they observed that Colton was alive, breathing, and actively moving around his cell.  ECF No. 83–1 at PageID #: 471.  Even if, as Plaintiff contends, CD Frame and CD Ferguson failed to complete all required and scheduled status checks, Colton was under constant audiovisual surveillance and continued to display erratic and dangerous behavior that warranted continued confinement.  CD Carducci was the officer-in-charge during the final three hours of Colton's detention.  ECF No. 83–1 at PageID #: 471.  She grew suspicious of Colton's condition, requested medical evaluation, and called for an ambulance.  Carducci Dep. Tr., ECF No. 83–13, Ex. L at PageID #: 607:11–13.  As the catalyst for emergency medical intervention, her conduct was commendable, not deliberately reckless.  Nothing in the record sufficiently establishes that CD Musolino, CD McCord, CD Kenney, CD Dreier, CD Frame, CD Ferguson, or CD Carducci violated Colton's constitutional right.

At all times, Custodial Defendants were sufficiently attentive considering Colton's volatile behavior and their collective experience in corrections and law enforcement.  Despite lacking medical training, Custodial Defendants monitored Colton's condition and attempted to secure aid for him when it was safe to do so.  Furthermore, it was CD Carducci's astuteness that led to Colton's transfer to the hospital, where he remained alive for another two days.  There is insufficient evidence for a reasonable jury to find that Custodial Defendants acted with deliberate recklessness "in the face of an unjustifiably high risk of harm" sufficient for Count 1 to survive summary judgment.  *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

23

(4:24-CV-00116)

### ii.   *Medical Defendants did not act with reckless disregard.*[18]

As with their custodial counterparts, Medical Defendants did not act with subjective reckless disregard towards Colton.  To be sure, Medical Defendants' position inherently incurs a less forgiving standard than Custodial Defendants'.  *See Berry*, 796 F. App'x at 862.  Even so, viewing the record in the light most favorable to Plaintiff, there is no genuine dispute of material fact as to whether any of them acted with reckless disregard towards Colton's condition sufficient to constitute a constitutional deprivation.  A reasonable jury could not render Plaintiff a favorable verdict on Count 1 under § 1983 against Medical Defendants.  *See* Fed. R. Civ. P. 56(a); *Karnes*, 398 F.3d at 873.

First, Plaintiff offers no discernible argument that MD Malvasi, LLC or MD Dr. Malvasi acted with reckless disregard towards Colton's medical needs.[19]  *See Brawner*, 14 F.4th at 596–97.  MD Dr. Malvasi never met or interacted with Colton, and Plaintiff does not plausibly

---

[18] Custodial Defendants provided non-binding supplemental authority to the Court *via Askew v. Trumbull County, et al.*, No. 4:21_CV_02133, 2025 WL 2897222 (N.D. Ohio Oct. 10, 2025), presumably to bolster their immunity defense.  The *Askew* court found that similarly situated medical staff ignored unmistakable signs of a detainee's worsening medical crisis (*e.g.*, severe abdominal pain, visible swelling, blood in urine and vomit, and pleas from both the detainee and other inmates) resulting in denials of summary judgment.  *See id.* at *9–10.  The present case lacks comparable evidence of deliberate indifference or malpractice.  Here, Colton was medically cleared upon intake, never requested medical attention, exhibited erratic behavior attributable to drug intoxication rather than physical illness, refused medical care, and impeded reassessment by medical staff.  Unlike *Askew*, there are no specific or articulable omissions suggesting reckless disregard for an obvious medical need.

[19] "Most would find the county's policy of contracting out detainee medical services to a private provider laudable in many respects."  *Graham*, 358 F.3d at 384.

(4:24-CV-00116)

contend that either he or his business acquiesced to unconstitutional conduct by their

subordinates.[20]

Second, Plaintiff fails to offer sufficient evidence that MD Bach, MD Thomas, or MD

Simmons acted with reckless disregard towards Colton.  MD Bach conducted Colton's medical

intake screening and signed an assessment form recording his history of drug abuse, present

intoxication, disheveled appearance, and bloodshot eyes.  ECF No. 1 at PageID #: 14.  She

determined Colton was fit to enter detention and that a medical lockdown was unnecessary.

Bach Dep. Tr., ECF No. 88 at PageID #: 993:2–23.  Again, Plaintiff's own experts do not

contend that Colton was medically fit to enter detention.  ECF No. 1 at PageID #: 13; Sanders

Dep. Tr., ECF No. 83–15, Ex. N at PageID #: 614:2–15; Bates Dep. Tr., ECF No. 83–6, Ex. E at

PageID #: 535:4–12.  Regarding detainees, MD Bach stated that "when they come in and they

say they're on drugs, we kind of automatically have them on our radar."  Bach Dep. Tr., ECF

No. 88 at PageID #: 983:13–14.

A report dated August 6, 2022 at 5:08 PM states Colton was assessed by MD Simmons,

who listed his condition as "highly intoxicated" under the influence of indeterminate substances.

ECF No. 1 at PageID #: 15.  At 10:30 PM, MD Simmons noted: "checked on inmate, being

down in booking since 5:00 PM and highly intoxicated . . . [i]nmate was in holding cell 3 kicking

and hitting the door and running around the cell.  His vitals were not checked."  ECF No. 1 at

---

[20] Nor could a reasonable jury conclude that MD Malvasi, LLC or MD Dr. Malvasi failed to notify their employees (*via* policy training, or supervision) "about the legal duty to provide constitutionally adequate medical care" because there was no "highly predictable consequence" that Medical Defendants would specifically violate Colton's constitutional right.  *Shadrick*, 805 F.3d at 737.

(4:24-CV-00116)

PageID ##: 18–19.  She made another note at 3:15 AM stating that "[Colton] was taken to T3.

Inmate had defecated himself in booking, made no request for medical attention."  ECF No. 1 at

PageID #: 25.  MD Simmons consistently made clear that "[d]ue to [Colton's] actions, his vitals

were not checked."  ECF No. 87, Ex. 1 at PageID #: 954.

MD Thomas was aware of Colton's detention and demeanor when she began her shift on

August 7, 2022.  Thomas Dep. Tr., ECF No. 104–2 at PageID #: 2588:16–18; ECF No. 1 at

PageID #: 28.  She partially obtained his vitals when summoned by CD Carducci.  Thomas Dep.

Tr., ECF No. 104–2 at PageID #: 2588:16–18 (testifying "I just got blood pressure and I wasn't

able to obtain a pulse ox."); ECF No. 143 at PageID #: 3719.  When she grew concerned, MD

Thomas rightly contacted MD Dr. Malvasi and coordinated with CD Carducci to call an

ambulance.  Thomas Dep. Tr., ECF No. 104–2 at PageID #: 2595:22–23; ECF No. 1 at PageID

##: 30–31.[21]  In the interim, MD Thomas assisted in applying an automated external defibrillator

to Colton.  Thomas Dep. Tr., ECF No. 104–2 at PageID ##: 2596:17–2597:12.  Nothing in the

record sufficiently establishes that MD Bach, MD Thomas, or MD Simmons violated Colton's

constitutional right.

Finally, the record contains no viable deliberate indifference claim against MD Ahart,

who never met or interacted with Colton.  Plaintiff failed to respond to MD Ahart's argument

that she is not liable for deliberate indifference.  Because Plaintiff failed to address it in their

---

[21] After Colton's death, CD Carducci added an entry to the inmate log stating that she had "asked MD Thomas to do an eval on this inmate."  ECF No. 1 at PageID #: 36.

(4:24-CV-00116)

opposition to summary judgment, that claim is waived.  *See Brown v. VHS of Mich., Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013).

Medical Defendants' conduct was reasonable in light of Colton's volatile behavior and their collective experience as medical professionals contracted for jailhouse medical work.  They consistently monitored Colton's condition and attempted to obtain his vitals when safe to do so.  When CD Carducci grew concerned, Medical Defendants responded immediately and, alongside Custodial Defendants, rendered aid—including cardiopulmonary resuscitation and defibrillation––until emergency medical technicians arrived.  Simmons Dep. Tr., ECF No. 104–2 at PageID ##: 2596:17–2597:16.  Plaintiff has not reasonably articulated how Medical Defendants *should* have behaved in treating an unstable pretrial detainee in the throes of what was believed by all Defendants to be a narcotics comedown.  *See, e.g., Trozzi*, 29 F.4th at 756 (explaining that "a detainee raising a Fourteenth Amendment medical deprivation claim must show that a reasonable officer at the scene—not one with the 20/20 vision of hindsight—would have known the detainee's medical needs posed an excessive risk.") (quoting *Kingsley*, 576 U.S. at 397 (cleaned up).  Medical Defendants are not corrections officers and were not obligated to risk life or limb to provide medical care to Colton when unsafe to do so.  There is insufficient evidence for a reasonable jury to find that they acted with deliberate recklessness "in the face of an unjustifiably high risk of harm."  *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

### iii.   Deliberate Indifference Summary

Neither Custodial nor Medical Defendants acted with reckless disregard sufficient to violate Colton's constitutional right to adequate healthcare.  Custodial Defendants acted reasonably by keeping Colton under observation, soliciting medical attention, and immediately

27

(4:24-CV-00116)

summoning external medical assistance when his condition deteriorated.  Likewise, Medical

Defendants acted reasonably by attempting to obtain Colton's vitals and providing medical

attention when safe to do so.  As a result of the attention paid him, Colton suffered no reckless

disregard sufficient for Count 1 to survive summary judgment.  Consequently, the Court need not

evaluate the final element of deliberate indifference: whether Defendants subjectively knew that

a failure to respond would pose a serious risk to Colton.  *See Trozzi*, 29 F.4th at 758.  Summary

judgment for all Defendants is appropriate and granted on Count 1.

### 2.  Count 2 and Count 3—Supervisory Violations[22]

In *Monell*, 436 U.S. at 658, the Supreme Court held that local governments may be sued

for civil rights violations.  Accordingly, state entities may be civilly liable under § 1983 when

their policies "subject, or cause to be subjected, any person . . . to the deprivation of any rights,

privileges, or immunities secured by the Constitution."  *Id.*  The conduct of a policymaking

official (*e.g.*, a county sheriff supervising a county jail) may represent official policy and

subsequently expose that official and agency to liability.  *See* 81 A.L.R. Fed. 549 (1987).  Under

*Monell*, however, institutional or supervisory liability arises only when that policy, custom,

failure to train, hiring error, or deficient supervision catalyzes an actual constitutional violation.

*See* 436 U.S. at 658; *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Vereecke v. Huron

Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010).  As a result, the operative issue for assessing

---

[22] Plaintiff's second and third counts are duplicative.  ECF No. 1 at PageID #: 52.  There is no theory of liability in Count 3 independent of that in Count 2.  Therefore, the Court analyzes them together.

(4:24-CV-00116)

Plaintiff's *Monell* claim is determining whether her brother suffered a constitutional deprivation. Because the Court determined that no Defendants acted with deliberate indifference towards Colton in Count 1, there is no underlying constitutional violation to support supervisory liability in Count 2 or Count 3. *See* 436 U.S. at 658.  Accordingly, neither CD Trumbull County nor CD Monroe are liable for supervisory violations under § 1983, and summary judgment in their favor is appropriate.

### 3.  Federal Claims Summary

Plaintiff's federal claims rise and fall together because their outcomes collectively hinge on material facts that cannot be genuinely disputed, even when the evidence is viewed in the light most favorable to Plaintiff.  This remains the fate of her claims even after considering the comparative caselaw she offers.  Her reliance on *Shumate v. City of Adrian*, 44 F.4th 427 (6th Cir. 2022); *Brawner*, 14 F.4th 585, *Greene*, 22 F.4th 593, *Burwell*, 7 F.4th 456, *McGaw v. Sevier Cnty.*, 715 F. App'x 495 (6th Cir. 2017), and *Rouster v. Cnty. of Saginaw*, 749 F.3d 437 (6th Cir. 2014) is misguided.  First, *Shumate* does not require the Court to adopt Plaintiff's interpretation of the security footage, but only to view genuine factual disputes in the light most favorable to Colton, and never when the video "blatantly contradicts" the clear version of events.  *See* 44 F.4th at 427.  Second, while *Brawner*, *Burwell*, and *Rouster* each recognized an objectively serious medical need, they rejected deliberate indifference when jail and medical staff acted, even if imperfectly, on available information.  *See* 14 F.4th at 585; 7 F.4th at 478; 749 F.3d at 440.  Third, *Greene* involved far more egregious neglect than Colton suffered—the detainee therein went four days without medical evaluation despite obvious withdrawal symptoms— and is, therefore, factually inapposite to this case.  *See* 22 F.4th at 593.  Finally, *McGaw* affirmed

29

(4:24-CV-00116)

summary judgment when officers reasonably deferred to medical staff guidance for monitoring an intoxicated detainee, as occurred here. *See* 715 F. App'x at 495. Collectively, these cases do not allow Plaintiff's claims to survive summary judgment because there is insufficient evidence that Defendants perceived and consciously disregarded a substantial risk to Colton's health.

### B.  Governmental Immunity

Apart from the substance of Plaintiff's claims, Custodial Defendants assert the dual defenses of federal qualified immunity and state statutory immunity. The doctrine of qualified immunity protects government officials from liability for civil damages, insofar as their conduct does not violate clearly established statutory or constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223 (2009). The Supreme Court outlines a two-step sequence to resolve qualified immunity claims. *See Saucier v. Katz*, 533 U.S. 194, 121 (2001).[23] First, a federal court must determine "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* Second—and only if the plaintiff has satisfied the first step—a court must determine "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* Accordingly, qualified immunity is only implicated when a defendant *violates a clearly established constitutional right.* *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added). Because the Court answered no in the first question, it need not

---

[23] In 2009, the Supreme Court clarified that "[o]n reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

30

(4:24-CV-00116)

resolve the second.  *See* *Gibson v. Abate*, No. 24–1929, 2025 WL 1913247, at *1 (6th Cir. July 11, 2025).  Custodial Defendants are entitled to federal qualified immunity against Plaintiff's federal claims because Colton did not suffer a violation of a clearly established constitutional right.[24]

The preceding principle extends stateward when federal qualified immunity and Ohio statutory immunity rest on the same questions of material fact.  Under such circumstances, a federal court "may review the state-law immunity defense through the lens of the federal qualified immunity analysis."  *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)).  Incorporating the analysis above, the facts and incidents alleged herein are sufficiently identical to justify analogous adjudication.[25]  Custodial Defendants are entitled to Ohio statutory immunity against Plaintiff's state claims because Colton did not suffer a violation of a clearly established constitutional right.  Custodial Defendants are immune and, therefore, further entitled to summary judgment on all Plaintiff's federal (Counts 1, 2, and 3) and state (Counts 7, 8, and 9) causes of action.

---

[24] Private medical providers working for the government (*e.g.*, all Medical Defendants herein) are not eligible for qualified immunity.  *See* *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012); *Howell*, 67 F.4th at 317.

[25] Even so, an independent analysis also establishes Custodial Defendants' entitlement to statutory immunity as employees of a political subdivision under Ohio Rev. Code § 2744.03(A)(6) (which provides for exceptions, none of which apply because, as explained above, Custodial Defendants did not act "with malicious purpose, in bad faith, or in a wanton or reckless manner.").

(4:24-CV-00116)

### C.  State Claims

#### 1.  Count 5—Medical Malpractice

In Ohio, a *prima facie* medical malpractice claim requires a plaintiff to establish evidence of: (1) the standard of care, generally shown through expert testimony; (2) a failure of the defendant to meet that standard; and (3) a direct and causal connection between the allegedly negligent act and the injury suffered.  *See Bruni v. Tatsumi*, 46 Ohio St. 2d 127 (Ohio 1976); Kester v. Brakel, No. 06-AP-253 2007 WL 353098 (Ohio App. 10 Dist. 2007).  Plaintiff alleges that Medical Defendants were required to aid Colton "in conformance with the skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar location" and that they breached that duty by failing to follow medical policy, immediately seek emergency medical care, or conduct an adequate medical examination.  ECF No. 1 at PageID ##: 58–59, ¶ 227–36.

The Court's finding that the Medical Defendants' conduct was not deliberately indifferent does not preclude liability under the lower standard for medical malpractice.  When the adequacy of medical treatment is at issue, a plaintiff can more easily prove a medical malpractice claim under state law than a constitutional violation under § 1983.  *See Estelle* 429 U.S. at 106.  Even so, Plaintiff has failed to establish a genuine dispute of material fact as to whether Medical Defendants are liable for medical malpractice for the reasons explained below. Plaintiff's briefings on this claim are threadbare.  While it is uncontested that Medical Defendants owed *some* duty of care to Colton, whether they breached that duty and caused Colton's harm is insufficiently argued.

32

(4:24-CV-00116)

First, Plaintiff has not established that MD Malvasi, LLC or MD Dr. Malvasi owed a duty of care to Colton. It is undisputed that MD Dr. Malvasi never saw Colton as a patient and, therefore, developed no doctor-patient duty to him. Regarding his company, the Ohio Supreme Court holds that a business cannot "practice medicine" and is thus incapable of committing medical malpractice. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939 (Ohio 2009). Even if the Court assumes that MD Dr. Malvasi and his business owed a duty of care, there is insufficient evidence that any breach of that duty caused Colton harm because Plaintiff does not sufficiently connect their conduct to his death.

Second, Plaintiff has not shown there is a genuine dispute of material fact as to whether MD Bach, MD Thomas, MD Simmons, or MD Ahart breached their duty to Colton or caused him harm. Rather, in Part III.A.1.b, the Court concluded that they acted reasonably by, among other things, attempting to obtain his vitals and providing medical attention when able to do so. Relying on the same facts and incorporating the preceding analysis, a reasonable jury could not render a favorable verdict for Plaintiff on her individual medical malpractice claims. Because Colton's harm was not proximately caused by medical care or treatment that fell below the requisite standard of care, summary judgment for all Medical Defendants is appropriate in Count 5.

### 2. Count 6—Vicarious Liability

Under the doctrine of *respondeat superior*, Ohio employers are liable for the acts of their employees committed within the scope of their duties. *See Forney v. Elks Grand Lodge, No. 96APE05572, 1996 WL 737575 (Ohio Ct. App. Dec. 24, 1996)* (citing *Hanson v. Kynast, 494 N.E.2d 1091 (Ohio 1986)*). Likewise, a provider of medical services "is vicariously liable

33

(4:24-CV-00116)

under the doctrine of *respondeat superior* for the negligent acts or omissions of its employees over whom the [provider] retains control or has a right of control while they are acting within the scope of their employment." *Smith v. Midwest Health Servs., Inc.*, No. C910754, 1993 WL 64260 (Ohio Ct. App. Mar. 10, 1993).

Plaintiff argues that MD Malvasi, LLC and MD Dr. Malvasi are "liable under the doctrine of *respondeat superior*/vicarious liability for the negligent conduct of their employees." ECF No. 1 at PageID #: 62.  MD Dr. Malvasi and his company can only be held liable on Count 6 if one of their subordinates committed medical malpractice.  *See Wuerth*, 913 N.E.2d at 939. Because the Court found there was no underlying medical malpractice by Medical Defendants in Count 5, there is no foundation for vicarious liability in Count 6.  *See Comer v. Risko*, 833 N.E.2d 712, 716–17 (Ohio 2005) ("If there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions.").

Finally, MD Malvasi, LLC is a registered limited liability company with MD Dr. Malvasi as sole principal and owner, yet Plaintiff has not argued why Dr. Malvasi, rather than his business alone, is vicariously liable.  *See* Ohio Rev. Code § 1706.26 ("A person who is a member of a limited liability company is not liable, solely by reason of being a member, for a debt, obligation, or liability of the limited liability company or a series thereof").  Accordingly, no vicarious liability exists for MD Malvasi, LLC or MD Dr. Malvasi.

### 3.  Count 8—Wrongful Death

In Ohio, wrongful death is a statutory state cause of action allowing recovery of damages proportional to the financial losses suffered.  *See* Ohio Rev. Code § 2125.02.  To succeed, a plaintiff must show that: (1) the defendant committed a wrongful act, neglect, or default that

(4:24-CV-00116)

proximately caused the decedent's death and would have allowed the decedent to recover

damages had they survived; (2) the decedent was survived by a spouse, children, parents, or

other next of kin; and (3) those survivors suffered damages because of the wrongful death.  *See*

Ohio Rev. Code § 2125.01.

As addressed, Plaintiff has not shown that Medical Defendants were either: (a)

deliberately indifferent to Colton's serious medical needs; or (b) breached a duty of care to him

thereby causing his death.  On the same facts and incorporating the analysis above, Plaintiff has

not established any wrongful act, neglect, or default that proximately caused Colton's death as

required for a wrongful death claim.  Because there is no genuine dispute of material fact, a

reasonable jury could not render a verdict for Plaintiff on Count 8.

### 4.  Count 9—Survivorship

Under Ohio law, a cause of action for personal injury survives a decedent's death.  *See*

Ohio Rev. Code § 2305.21.  A survivorship claim generally exists separate and apart from a

wrongful death claim.  *See Shinaver v. Szymanski,* 14 Ohio St. 3d 51 (1984) ("Under the general

survival statute . . . a victim's right of action for personal injuries survives and passes to her

personal representative, and may be instituted for the benefit of the estate, notwithstanding that

death resulted from injuries for which an action could also be maintained[.]").  Although

Plaintiff's Count 9 may be asserted apart from her wrongful death claim, it can only be brought

on Colton's behalf.  *See Wingrove v. Forshey,* 230 F. Supp. 2d 808, 826 (S.D. Ohio 2002);

*Dickerson v. Thompson,* 89 Ohio App.3d 399 (1993).  Related courts have hold that a

survivorship cause of action "is derivative of the principal claims in a complaint."  *Stratford v.*

*SmithKline Beecham Corp.*, No. 2:07-CV-639, 2008 WL 2491965, at *9 (S.D. Ohio June 17,

35

(4:24-CV-00116)

2008) (citing *Glassner v. R.J. Reynolds Tobacco Co.*, No. 5:99 CV-0796, 1999 WL 33591006 (N.D. Ohio June 29, 1999)).  Accordingly, the Court finds that: (1) Colton's death was an "injury to a person," sufficient for the state-law claims to survive his death; and (2) summary judgment for Count 9 is appropriate because there are no remaining causes of action from which it may derive.  *See also Witcher v. Fairlawn*, 680 N.E.2d 713 (Ohio Ct. App. 1996).

## IV.   CONCLUSION

Viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiff, the Court concludes that there is no genuine issue of material fact requiring resolution *via* trial.  Defendants are entitled to judgment as a matter of law on all claims under Fed. R. Civ. P. 56(a).  Custodial Defendants' Motion for Summary Judgment (ECF No. 83) and Medical Defendants' Motion for Summary Judgment (ECF No. 106) are granted.[26]  A separate entry of judgment shall issue.

IT IS SO ORDERED.

October 30, 2025                                                     */s/ Benita Y. Pearson*
Date                                                                      Benita Y. Pearson
                                                                               United States District Judge

---

[26] Consequently, Medical Defendants' Motion in Limine (ECF No. 145) and  the Joint Motion to Continue Trial (ECF No. 146) are denied as moot.

36